MoKiNNEY, J.,
delivered the opinion of the Court.
This bill was filed in the Chancery Court at Knoxville, to have rescinded and annulled, a contract entered into on the 28th of September, 1855, for the purchase of a supposed banking institution, located at Knoxville, including the capital stock, debts, and effects of every description, by the complainant, from the defendants, Doolittle & Co., for the consideration of $37,500.00, for which the former executed his several promisory notes payable to the latter.
The supposed institution claimed a legal existence, under and by virtue of an act of the General Assembly of this State, passed on the second of March, 1854. It went into operation in January, 1855, under the adopted name of “ The Miners and Manufacturers’ Bank,” the stock being owned by the defendants, Doolittle & Co.
The act of 2d of March, 1854, above referred to, contains seventy-five sections. By said act, various companies were incorporated for different purposes, having no connexion with, or relation to each other. By the four last sections of the act, certain persons therein named, “ were created a body politic and corporate, by the name and style of the Southern Mining Company.” In addition to numerous and extensive powers conferred upon said company, in express terms, there is a provision in the 73d section, that it should *80 “ have all the powers, franchises, * rights, privileges, and immunities conferred upon the corporation and body politic, created by an act December 27th, 1843, ch. 60.” The act here referred to, merely by the date of its passage and chapter, was the charter of incorporation of the “Bank of East Tennessee,” with a capital stock of eight hundred thousand dollars.
Under the banking power thus derived, the “Miners and Manufacturers’ Bank” was established.
The act of 2d March, 1854, under which said Bank claimed to have been chartered, contained (in the 3d and 46th sections) the reservation of an express power to repeal and dissolve any company created by virtue of that act, “ at the pleasure of the Legislature.” And in the exercise of the power thus reserved, the Legislature— for reasons deemed sufficient — by an act passed on the 28th of February, 1856, ch. 113, sec. 16, repealed and annulled, in loto, the charter granted to the before named “ Southern Mining Company,” so far as said charter conferred “banking privileges” on said company.
It appears, that not long after the passage of the act of March 2, 1854, the charter of the “ Southern Mining Company” was offered for sale; and a copy of what purported to be the entire charter of said company, was .procured. This copy embraced the four last sections (secs. 72, 73, 74, 75,) of the act above referred to; to which was appended, in full, the charter of the “ Bank of East Tennessee.” This copy was duly certified by the Secretary of State, under the seal of the State, to be “a full and perfect copy of all that part of an act passed March 2, 1854, by the General Assembly of said State, which relates to the Southern Mining Company.” *81 But, in said copy, the sections reserving to the Legislature the• right and power of repeal, at pleasure, were zoholly omitted.
Upon the faith of this copy being what it imported upon its face, and was certified to be by the proper officer, a full and - perfect copy of the charter of said company; the defendants, Doolittle & Co., became ;'the-purchasers thereof, in the latter part of the year 1854, for which they paid $12,500.00; and in the like faith,, the complainant contracted with them for the purchase of the bank, (established under said charter,) in September, 1855. The fact, indeed, is placed beyond all question,- that no one of the parties to this suit, or connected with the bank, had any knowledge, or even-suspicion, that the charter of the company, under which the bank was organized, was at all subject to the will or power of the Legislature, until the passage of the-repealing act of February 28th, 1856. And even then, it. was denied by the bank, that the sections of the act1 reserving the power of repeal, had any application to-the charter granted to the “Southern Mining Company;” but, on the contrary, had reference alone to the companies created by the sections of the act,, which, in the order of place and number, preceded those sections which conferred the power of repeal. And this opinion was-entertained, it seems, until, in a judicial proceeding, to which the bank was a party, it was declared by this Court, in September, 1856, that the power of repeal extended, as well to the charter under which the “Miners and Manufacturers’ Bank” claims a corporate existence, as to all the other charters of incorporation granted by the act. (See 3 Sneed, 610.) And that by *82 the repealing act of 1856, the legal existence of the bank was totally destroyed.
It appears from the proof, that the purchase of the charter by the defendants, Doolittle k Co., was partly negotiated through the complainant. It likewise appears, that the complainant was made President of the bank on its first establishment in January, 1855, and that he remained in that office up to September of the same year, when, by his purchase from Doolittle & Co., he became sole owner of the bank. It is shown in the proof, that, prior to September, 1855, the Bank had become embarrassed in its operations, mainly in consequence of large advances made to the complainant, and also, to Doolittle & Co. To relieve the bank of this embarrassment, the complainant went to Philadelphia— where Doolittle & Co. resided — and negotiated a purchase of their entire interest in the bank.
It is also shown in the proof, that the promissory notes made by the complainant to Doolittle & Co., in consideration of the purchase of the Bank, were, at the time of their execution, transferred by indorsement, in part, to the defendant, Puller, and in part to one Bar-nitz.
Prior to the 28th of September, 1855, the date of the complainant’s purchase of the bank, Doolittle & Co. .were largely indebted to Puller and Barnitz, severally, for moneys by them advanced to the former, for the benefit of said bank. Por these advances, Puller and Barnitz, respectively, held the promissory notes of Doolittle & Co.; to secure the payment of which, the latter had placed in their hands various stock bonds and other evidences of debt, and also a large amount of the issues *83 of said bank. It seems that Fuller and Barnitz were parties to tbe negotiation between tbe complainant and Doolittle & Co., in relation to tbe purchase of tbe Bank. And by an arrangement between tbe parties, with tbe mutual consent of all, tbe notes of tbe complainant were transferred to Fuller and Barnitz, and accepted by them, in lieu of tbe notes which they respectively held on Doolittle & Co.; and certain mortgages executed by complainant, to secure the payment of bis notes to Doolittle & Co., were, at tbe same time, transferred to Fuller and Barnitz. Upon this transfer being made, tbe latter gave up to the former tbe promissory notes which they held on them; but, as further security retained the collaterals which had been pledged to secure the payment of said notes thus given up, and refused to surrender them until their respective debts were' fully paid.
The proof, upon this point of the case, establishes, that the notes of the complainant were not accepted by Fuller and Barnitz in absolute payment of their pre-existing debts against Doolittle & Co. This fact is placed beyond question by their requirement that the liability of Doolittle & Co. should be continued by their indorsement of the complainant’s notes; and likewise by the requirement, that the collaterals deposited with them for the security of the pre-existing indebtedness of Doolittle & Co., should still be retained. Both of these requirements are utterly incompatible with the idea that the complainant’s notes were received in discharge of the prior indebtedness of Doolittle & Co.
The result of the proof, then, is, that the complainant’s notes were taken merely as additional security for *84 a prior indebtedness, and fwith Ml knowledge of the consideration for which they were given.
It should have been previously noticed, that Barnitz, being indebted to Fuller, transferred to the latter the notes of the complainant which had been indorsed to> him, together with the mortgage for the security of the debt.
Upon the foregoing facts, two questions are submitted for our determination. First. Whether or not, as against the defendants, Doolittle & Co., the complainant is entitled to a recision of the contract. And if so, secondly. Whether or not the notes in the hands of the defendant, Fuller, are subject to the same equity, as if they still remained in the hands of the payees.
1. The complainant cannot, we think, be repelled on the ground, that the charter, being a public act, the law imputes to the complainant, and charges him with knowledge at the time of making the contract, not only of the entire contents of the charter, as a matter of fact; but, likewise, of the rules and principles of law-applicable to each and all of its several provisions. This position is not tenable. Whether an act incorporating a Bank, for the sole benefit of private individuals, may not, in some sense, and for some purposes, be regarded as a public law, is a question we need not now discuss. For, if this were even to be admitted, no one will be heard to say, that it is a general law, affeeting the whole- community. And we have held, that the familiar maxim, that ignorance of the law is no excuse for the' breach or non-performance of any agreement, because any one is presumed to know the law, applies only to general public laws, which prescribe a rule of action for the *85 whole community; and that it has no application whatever to special or private laws, which are only intended to operate upon particular individuals. See 1 Sneed, 698-716.
A special or private law, in this respect, stands upon the same footing with the -law of another government. And all the' authorities concur, that ignorance of foreign law is deemed to be ignorance of fact; because no person is presumed to know the foreign law; and it must be proved as a fact. 1 Story’s Eq. Jur., sec. 140, and note 3. And in this view, it has been held, and we think correctly, that the laws of the other States of the Union are to be regarded as foreign laws. 9 Pick. R., 112; 3 Shepley R., 45.
We perceive no sufficient reason why a private bank charter — which is merely the title of the parties-«-should be placed upon a different footing, as regards the application of the legal maxim under consideration, from a title to other private property.
But, again: the same result must be arrived at upon the principles assumed in the argument for the defendants.
The well established principle, both in equity and at law, upon which the argument against relief in this case is based, — that ignorance or mistake of law, will not be allowed to affect the solemn contracts of parties, nor excuse from the legal consequences of particular acts, — is to be taken with this important qualification, that there is no mistake of fact, no trust, or element of fraud, mixed up with it. 1 Story’s Eq. Jur., sec. 110—136; Adams’ Eq., 188-9. It will be found, upon an examination of the best considered cases, that tlie *86 application of this highly artificial and rigid doctrine, has been confined to cases of pure, unmixed mistake of law. But, if a contract is entered into in good faith, by which it is mutually understood and intended that, for an adequate consideration, the one party shall part with, and the other acquire, a valid title to property; and it turns out that, at the time of the contract, by the operation of some settled principle of law — of which they were alike ignorant — the supposed title was wholly valueless, or did not exist, in legal contemplation; in such case, the mistake is not a mere mistake of law; it involves in some measure a mistake of fact, as well as of law; as the very idea of title comprehends as well matter of fact, as of law. 1 Story's Eq., sec. 122-130.
Butj' in the case under consideration, the mistake, as it seems to us, was properly a mistake of fact. The parties, at the time of the contract, mutually believed— as they well might — that the copy of the charter, furnished by the proper officer, was a full and perfect copy. They mutually assumed that the charter was indefeasible, during the period for which the charter was granted; and that the corporate rights, privileges, and immunities thereby conferred, were beyond the control of the Legislature, or any other power known to the government. They were alike utterly ignorant of the fact, that there was an omission in the copy of the charter, under which they acted, to set forth the all-important condition, contained in the original act of incorporation; by which the corporate existence of the bank instead of having an absolute, unconditional right of duration, subjeet to no human contingency, for the *87 period limited in the charter, — was in reality a thing at the mere pleasure of the Legislature, subject to destruction at any moment; and which, in fact, was totally destroyed, in the short period of five months after the date of the contract. This, then, was a mistake of fact, resulting from ignorance of the omission in the copy as well as from ignorance of the existence of the reserved power of repeal, in the original charter.
That this is such a mistake, as a Court of Equity will relieve against, can admit of no doubt. It is, in principle, like the case of a contract made for a consideration which is really non-existent, but which both parties, at the time, mistakenly suppose to exist. In such case, the one cannot give, nor the other receive, the thing intended to pass: and the obvious equity is, to replace the parties in statu quo.
In cases of mutual mistake, of this description, going to the essence of the contract) it is not necessary that there should be any element of fraud to warrant the interposition of a Court of Equity; on the contrary, equity will relieve on the ground of mutual mistake as to the existence of the thing which constituted the basis of the contract. See Adams’ Eq., 188-19; 1 Story’s Eq., sec. 140, 146.
Nor does the fact, that the reserved power of repeal had not been exercised, at the date of the contract; and, by possibility, might never be exercised, affect the principle. It is enough that there was a radical defect inherent in the subject matter of the contract — of which the parties were mutually ignorant— which might at any moment work its entire destruction. *88 The contract, therefore, was not what either of the parties understood and intended it should be.
Nor does the fact, that the purchase of the charter, by the defendants, was negotiated through King, affect the case: as there is not the slightest reason to suppose, from the proof in the record, that either he, or any of the other parties, had any suspicion of the omission in the copy of the charter, prior to the repeal in February, 1856. This disposes of the case as to the defendants, Doolittle & Co.
The remaining question is — whether the notes, in the hands of defendant Fuller, are subject to the same equities as between the original parties.
According to the course of decision in this State, the transfer of negotiable paper in payment of, or as security for, a pre-existing debt, is not a transfer in the due course of trade, so as to protect the paper in the hands of the holder from the equities to which it was subject between the original parties. 2 Humph., 192; 1 Humph., 468; 6 Humph., 443.
But, as it appears that the notes in question were both made and indorsed in the city of Philadelphia, of course the determination of this question must be governed by the law of the place where the contract of indorsement was made. We have been referred to several Pennsylvania cases, from which it seems ' that the course of judicial decision, upon the question, is different in that State from ours. Yet it appeai’3 to be settled there, that the transfer of the note of a third person, as collateral security for a pre-existing debt, without some new and distinct consideration, will not place the person to whom it is transferred in the condition of a *89 holder for value, so as to protect him against the equities subsisting between the original parties. 11 Serg. & Rawle, 377; 6 Wharton, 220; 9 Harris, 237; 4 Binney, 366. And this is enough for the determination of the present case.
We have seen that the notes of the complainant were received by Fuller, merely as additional, or collateral security for a pre-existing debt due to him from Doolittle & Co., and really without any distinct new consideration.
It likewise clearly appears, that Fuller had full knowledge of the consideration for which said notes were given, and of all the facts connected with the transaction between the complainant and Doolittle & Co.
The relation of Fuller to that transaction is peculiar. Though the proof is rather obscure, yet there are circumstances tending to induce a belief that he was in some way secretly' interested with Doolittle & Co., in’ the bank, and in the dealings with the complainant. The proof is clear, that he participated actively in the negotiation for the sale of the bank' to complainant; and, indeed, the terms of the agreement seem to have been chiefly adjusted through his instrumentality.
We are of opinion, therefore, that the defendant Fuller, is affected with all the equities which existed against the notes in the hands of Doolittle & Co.
It follows, therefore, that the complainant is entitled to a recision of the contract, and to have the several notes surrendered up and cancelled; and also to have refunded the amount paid in discharge of the first note with interest thereon. And it will be so decreed.
Decree of the Chancellor reversed.